IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DEBORAH LOTT, Individually, and as          )
Personal Representative of the Estate of    )
Sara Kelsey Lott, Deceased, et al.,         )
      Plaintiffs,                            )
                                             )
        v.                                   )      Case No. 1:11cv362
                                             )
SCOTTSDALE INSURANCE                        )
COMPANY,                                    )
        Defendant.                           )

OCT 2 7 2011

## MEMORANDUM OPINION

At issue in this diversity declaratory judgment action are the following two questions of

insurance policy interpretation:

(i)     Whether it is appropriate to refer to parol evidence to identify the entity that parties intended to insure under a policy where, as here, the policy's named insured is a non-existent or inactive entity.

(ii)    Whether an insurance policy covers the allegedly negligent provision of lifeguard services and pool safety, rescue, and resuscitation equipment where, as here, the policy does not explicitly refer to these matters, but excludes from coverage "all operations not related to pool sales, service or maintenance."

I.

Plaintiffs Deborah Lott and Douglas Lott (collectively "the Lotts") are residents of

Virginia. On July 21, 2008, their twelve year old daughter, Sara Kelsey Lott, was found face

down and not moving in a swimming pool at Lake Ridge Community Swim Club ("Lake

Ridge") in Occoquan, Virginia. Sara, it turned out, had suffered hypoxic injury to her brain due

to loss of oxygen, and she died two days later. Following this tragic event, the Lotts filed a

Virginia wrongful death action in the Prince William County Circuit Court (the "Underlying

Lawsuit") against five defendants: (i) Lake Ridge and (ii) the following four Palm Pools

defendants: (a) Palm Pool Management, Inc., (b) Palm Pools Service Corp., (c) Palm Pools Corp., of Maryland, and (d) ICA/Palm Pools Corp. (collectively "Palm Pools").  In the Underlying Lawsuit, the Lotts allege that Palm Pools was responsible for operating the swimming pool at Lake Ridge and was negligent in providing lifeguard services and pool safety, rescue, and resuscitation equipment.  Based on these allegations, the Lotts assert claims against Palm Pools for, *inter alia*, wrongful death and negligent hiring, training, retention, and supervision of lifeguards.

Prior to this tragic event, defendant Scottsdale Insurance Company ("Scottsdale") had issued a primary commercial general liability insurance policy (the "Primary Policy") to "Palm Pools Management Corporation" and an excess liability insurance policy (the "Excess Policy") to "Palm Pools Inc." for the period from June 9, 2008 to June 9, 2009.  When Palm Pools provided Scottsdale with timely notice of the Underlying Lawsuit, Scottsdale responded by denying that it had any duty to defend Palm Pools in that lawsuit or to indemnify Palm Pools for any damages resulting from that lawsuit.  Thereafter, the Lotts, Lake Ridge, and Lake Ridge's insurance provider, Harleysville Insurance Company ("Harleysville") – which has agreed to defend and indemnify Lake Ridge in the Underlying Lawsuit – filed a declaratory judgment action against Scottsdale and Palm Pools in Prince William County Circuit Court.  In their declaratory judgment complaint, plaintiffs request a declaration that Scottsdale has both (i) a duty to defend Palm Pools against the claims asserted in the Underlying Lawsuit, and (ii) a duty to indemnify Palm Pools for any settlement or judgment resulting from the claims in the Underlying Lawsuit.  Plaintiffs also seek "such other relief [deemed] just and appropriate, including plaintiffs' attorneys' fees incurred prosecuting this action."

Scottsdale removed the action to federal court and sought realignment of the Palm Pools entities as plaintiffs in order to establish the requisite diversity of citizenship. The realignment motion was granted by Order dated May 9, 2011, at which time the Palm Pools entities became plaintiffs and Scottsdale remained the sole defendant. *See Lott v. Scottsdale Ins. Co.*, --- F.Supp.2d. ----, 2011 WL 2022539 (E.D. Va. May 9, 2011). Thereafter, Lake Ridge and Harleysville were dismissed as plaintiffs for lack of standing. *See Lott v. Scottsdale Ins. Co.*, --- F.Supp.2d. ----, 2011 WL 4374824 (E.D. Va. Sept. 14, 2011). In addition, Palm Pools and the Lotts filed an amended complaint which sought the same declaratory relief, but included Palm Pools as plaintiffs and a claim for breach of contract, which is the gravamen of the requested declaratory relief. At this time, both parties have filed potentially dispositive motions. Plaintiffs have filed a motion for summary judgment, and Scottsdale has filed a motion to dismiss, or in the alternative, for summary judgment on the amended complaint.

II.

Dismissal pursuant to Rule 12(b)(6), Fed.R.Civ.P., is appropriate where the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 1973 (2007)). It follows that to survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, the complaint must allege facts that, if true, plausibly satisfy each element of the claims for which relief is sought. Accordingly, a motion to dismiss must be granted if the complaint

does not allege a sufficient factual basis to create a plausible inference that plaintiff is entitled to relief.

Summary judgment is appropriate under Rule 56, Fed.R.Civ.P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). Importantly, to defeat summary judgment, the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986). Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless that party adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

III.

The legal principles governing an insurer's duty to defend and indemnify are well-settled in Virginia.[1] The principal governing rule is that a duty to defend depends on whether any allegations in the Underlying Lawsuit's complaint (the "Underlying Complaint") fall within the policy's coverage. *See VEPCO v. Northbrook Property & Cas. Ins.*, 252 Va. 265, 268, 475 S.E.2d 264, 265 (1996) (*quoting Lerner v. Safeco*, 219 Va. 101, 104, 245 S.E.2d 249, 251 (1978)). This rule, often referred to as the Eight Corners Rule, requires a court to compare the

---

[1] Because this is a diversity action, questions of state law are governed by the forum state's law, including the forum's choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Virginia law applies the law of the place where an insurance contract is written and delivered. In this matter, the policy was delivered in Virginia, thus Virginia law applies. *See Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635-6 (4th Cir. 2005); *Highway Exp. Inc. v. Federal Ins. Co.*, Nos. 93-1715, 93-1889, 1994 WL 95956, at *3 (4th Cir. March 24, 1994) (unpublished table decision); *Hardware Mut. Casualty Co. v. Wendlinger*, 146 F.2d 984, 989 (4th Cir. 1944).

four corners of the insurance policy against the four corners of the underlying complaint; if any of the complaint's allegations may potentially be covered by the policy, the insurer has a duty to defend. *See America Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F.Supp.2d 459, 465 (E.D. Va. 2002). An insurer is only relieved of its duty to defend if it appears clearly that the insurer would not be liable under its policy for any judgment based upon the complaint's allegations. *See Brenner v. Lawyers Title Ins. Corp.*, 240 Va. 185, 189, 397 S.E.2d 100, 102 (1990).

It is also well-settled that an insurer's duty to defend is broader than its duty to indemnify, inasmuch as the duty to defend turns on a complaint's allegations whereas "a duty to indemnify 'springs from the facts actually discovered or proven at trial.'" *Morrow Corp. v. Harleysville Mut. Ins. Co.*, 101 F.Supp.2d 422, 435 (E.D. Va. 2000) (*quoting Liberty Life Ins. Co. v. Travelers Indem. Co.*, 181 F.3d 88, 1999 WL 417436, at *4 (4th Cir. 1999) (unpublished)). Thus, unless there is no duty to defend or indemnify, a duty to indemnify can only be determined after resolution of the facts alleged in the underlying complaint. *See Minnesota Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 355 Fed.Appx. 698, 704 (4th Cir. 2009) (*quoting Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004)); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Block Roofing Corp.*, 754 F.Supp.2d 819 (E.D. Va. 2010)). As a result, there may be some instances in which an insurer has a duty to defend, yet ultimately will not to have a duty to indemnify. A duty to defend limited to and coextensive with a duty to indemnify would be inadequate; insureds pay a premium for what is partly "litigation insurance" designed with the purpose of "protecting the insured from the expense of defending suits brought against him." *Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 448 F.3d 252, 258 (4th Cir. 2006).

IV.

Scottsdale argues that it has no duty to defend or indemnify Palm Pools in the Underlying Lawsuit because its policies do not provide coverage for any of the actions or inactions alleged in the Underlying Complaint. Scottsdale points to two specific provisions of the Primary Policy for this assertion. First, Scottsdale argues that only one Palm Pools entity, Palm Pool Management, Inc., has standing to assert a duty to defend or indemnify because it is the sole named insured.[2] Plaintiffs respond that because the policy's named insured is a non-existent entity, there is a latent ambiguity in the policy that requires resort to parol evidence and that the pertinent parol evidence demonstrates that the intended insured is ICA/Palm Pools Corp. ("ICA/PPC"), an existing and active entity. Second, Scottsdale argues that the Designated Operations Exclusion in the Primary Policy (the "Exclusion"), which excludes from coverage "all operations not related to pool sales, service or maintenance," operates here to bar coverage for the allegedly negligent provision of lifeguard services and pool safety, rescue, and resuscitation equipment. Plaintiffs respond the language of the exclusion is patently ambiguous and should therefore be construed against the insurer.

A.

Few fields of the Virginia legal landscape are as well-plowed as that pertaining to the interpretation and construction of insurance policies. It is axiomatic that insurance policies, like all contracts, must be interpreted "in accordance with the intention of the [contracting] parties gleaned from the words they have used in the document." *Seals v. Erie Ins. Exch.*, 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009) (*quoting Floyd v. N. Neck Ins. Co.*, 245 Va. 153, 158, 427

---

[2] While this is raised as a standing issue, it is also a coverage issue: only the entity or entities that are covered by the Primary Policy have standing in this matter. *See Lott v. Scottsdale Ins. Co.*, --- F.Supp.2d ----, 2011 WL 4374824 (E.D. Va. Sept. 14, 2011)

S.E.2d 193, 196 (1993)).   And to accomplish this, the words in the policy, when unambiguous, must be given their plain and ordinary meaning, without reference to parol evidence. *See Partnership Umbrella, Inc. v. Federal Ins. Co.*, 260 Va. 123, 133, 530 S.E.2d 154, 160 (2000); *Hill v. State Farm Mutual Automobile Ins. Co.*, 237 Va. 148, 152, 375 S.E.2d 727, 729 (1989). Of course, policy language is not always clear and unambiguous.   It may, on occasion, be infected with ambiguity.   This occurs when "the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." *Virginia Elec. and Power Co. v. Norfolk Southern Ry. Co.*, 278 Va. 444, 460, 683 S.E.2d 517, 526 (2009).

Importantly, Virginia law distinguishes between ambiguities that are patent and those that are latent. An ambiguity is patent where it is apparent on the face of the policy that the language can be interpreted in more than one way. *See Va. Elec. & Power Co.*, 278 Va. at 460.   An ambiguity is latent where the language in question appears "perfectly clear" at the time of contract formation, but owing to "subsequently discovered or developed facts, may reasonably be interpreted in either of two ways." *Id.*   The importance of this distinction lies in the law's treatment of the two types of ambiguities.   In accordance with a core principle of Virginia law, patent ambiguities in policy language must be construed without the aid of parol evidence, against the insurer, who, as the expert drafter of the policy, is responsible for selecting policy language that is clear and unambiguous.[3]   By contrast, parol evidence may be used to resolve

---

[3] *See, e.g., Res. Bankshares Corp*, 407 F.3d at 636; *Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 233-4, 415 S.E.2d 131, 134 (1992). *See also St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc.*, 227 Va. 407, 411, 316 S.E.2d 734, 736 (1984) (exclusionary language is construed "most strongly" against the insurer).

latent ambiguities.[4]  And finally, another core Virginia principle applicable here is that while a

policyholder bears the burden of proving that their conduct is covered by the policy, the insurer

bears the burden of proving that an exclusion precludes coverage.[5]

Scottsdale disputes that Virginia treats latent and patent ambiguities differently, arguing

that parol evidence is admissible to resolve both types of ambiguity in insurance policies.  This

argument is unpersuasive; it runs counter to both long-standing, venerable Virginia precedent

and to recent decisions, as well.  As long ago as 1887, the Supreme Court of Virginia explained

that "[t]here are cases in which resort may be had to parol evidence to ascertain the subject

insured, but they are cases of latent ambiguity." *Home Ins. Co. v. Gwathmey*, 82 Va. 923, 1 S.E.

209, 211 (1887). *See also Connecticut Fire Ins. Co. v. W.H. Roberts Lumber Co.*, 119 Va. 479,

89 S.E. 945, 948 (1916).  And, more recently, in 2002, the Supreme Court of Virginia reaffirmed

the patent/latent ambiguity distinction, stating that while insurance policies typically are

construed without reference to parol evidence, "resort to parol evidence is proper where a latent

ambiguity exists...." *Southern Ins. Co. of Virginia v. Williams*, 263 Va. 565, 570, 561 S.E.2d

730, 733 (2002).

To be sure, Virginia courts, as Scottsdale correctly notes, have not always been consistent

in observing the patent/latent ambiguity distinction in all types of contracts.  At times, it appears

that the Supreme Court of Virginia has allowed use of parol evidence to resolve both types of

---

[4] *See Southern Ins. Co. of Virginia v. Williams*, 263 Va. 565, 570, 561 S.E.2d 730, 733 (2002). *See also Nationwide Mut. Ins. Co. v. Overlook, LLC*, --- F.Supp.2d ---, 2011 WL 1988396, at *9 (E.D. Va. May 13, 2011); *Builders Mut. Ins. Co. v. Parallel Design & Development LLC*, --- F.Supp.2d ----, 2011 WL 1988402, at *12 (E.D. Va. May 13, 2011); *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, --- F.Supp.2d ----, 2011 WL 1597530, at *4 (E.D. Va. Apr. 26, 2011).

[5] *See Am. Reliance Ins. Co. v. Mitchell*, 238 Va. 543, 547, 385 S.E.2d 583, 585 (1989); *Maryland Cas. Co. v. Cole*, 156 Va. 707, 716, 158 S.E. 873, 876 (1931).

ambiguities in contracts other than insurance policies.[6] And, in one instance, *State Farm Mut. Auto. Ins. Co. v. Justis*, a case heavily relied on by Scottsdale, the Supreme Court of Virginia considered parol evidence in construing an arguably patent ambiguity in an insurance policy. *See State Farm Mut. Auto. Ins. Co. v. Justis*, 168 Va. 158, 164-165, 190 S.E. 163, 166 (1937). If so read, *Justis* is at most an outlier; the Supreme Court of Virginia has never cited *Justis* to support the use of parol evidence to resolve patent ambiguities in insurance policies. To the contrary, patent ambiguities in insurance policies are routinely construed against the insurer.[7] As the Fourth Circuit has noted, "Although... Virginia cases state that standard contract law governs the interpretation of insurance contracts, the cases applying the doctrine of *contra proferentum* [*i.e.*, construing an ambiguity against the insurer, who drafted the policy,] do not require extrinsic evidence once an exclusion has been deemed ambiguous." *See Highway Exp. Inc. v. Federal Ins. Co.*, Nos. 93-1715, 93-1889, 1994 WL 95956, at *6 (4th Cir. March 24, 1994) (unpublished table decision).

In sum, the patent/latent ambiguity distinction is deeply rooted in Virginia law and soundly based.    Patent ambiguities are the product of careless drafting and, as a result, are appropriately construed against the insurer, the expert drafter of the policy. By contrast, latent

---

[6] *See, e.g. Eure v. Norfolk Shipbuilding & Drydock Corp., Inc.*, 263 Va. 624, 632, 561 S.E.2d 663, 667 (2002); *Aetna Cas. and Sur. Co. v. Fireguard Corp.*, 249 Va. 209, 215, 455 S.E.2d 229, 232 (1995); *Cascades North Venture Ltd. Partnership v. PRC Inc.*, 249 Va. 574, 579, 457 S.E.2d 370, 373 (1995). *But see Galloway Corp. v. S.B. Ballard Const. Co.*, 250 Va. 493, 502, 464 S.E.2d 349, 354 (1995) (applying patent/latent ambiguity distinction in non-insurance contract); *Zehler v. E. L. Bruce Co.*, 208 Va. 796, 799, 160 S.E.2d 786, 789 (1968) (same).

[7] *See, e.g., Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 415 S.E.2d 131 (1992); *Smith v. Allstate*, 241 Va. 477, 403 S.E.2d 696 (1991); *Hill v. State Farm Mutual Automobile Ins. Co.*, 237 Va. 148, 375 S.E.2d 727 (1989); *American Reliance Ins. Co.v. Mitchell*, 238 Va. 543, 385 S.E.2d 583 (1989); *Caldwell v. Transportation Insurance Co.*, 234 Va. 639, 364 S.E.2d 1 (1988); *Lincoln Nat. Life Ins. Co. v. Commonwealth Corrugated Container Corp.*, 229 Va. 132, 327 S.E.2d 98 (1985).

ambiguities do not appear on the face of the policy at the time of drafting, but only arise or become apparent later in the subsequent application of the policy to external facts. *See Builders Mut. Ins. Co. v. Parallel Design & Development LLC*, --- F.Supp.2d ----, 2011 WL 1988402, at *9 (E.D. Va. May 13, 2011) (*quoting Zehler v. E. L. Bruce Co.*, 208 Va. 796, 799, 160 S.E.2d 786, 789 (1968)).

It remains to apply these settled principles to this dispute. Before doing so, however, a more detailed discussion of the policies at issue and the history between the parties is required.

## B.

More than ten years ago, Palm Pools first began its relationship with Scottsdale. Warren Cox, the insurance agent for Palm Pools, purchased insurance from Scottsdale through Scottsdale's general issuing agent, Royal Oak Underwriters ("Royal Oak"). Patti Nunnally, Scottsdale's primary contact at Royal Oak, testified in her deposition that initially Palm Pools, under the name "Palm Pools Corporation," purchased general liability insurance from Scottsdale that included coverage for lifeguard services. In 2000, according to Nunnally, Scottsdale refused to renew coverage for lifeguard services owing to large losses incurred by Palm Pools relating to such services. Nunnally further stated that Scottsdale only agreed to continue to provide coverage to Palm Pools based on representations that there were two legal entities under the Palm Pools umbrella, one that provided pool repairs and maintenance services and one that provided lifeguard and management services, and that coverage would be issued only to the former.

In 2000, consistent with Nunnally's narrative, the terms of the primary policies issued by Scottsdale to Palm Pools changed. The premium dropped from over $20,000 per year to only $2,500 per year, the named insured became "Palm Pools Management Corp.," and an Exclusion

-10-

was added that barred coverage for "all operations relating to lifeguards and/or pool management." Urban Gochoel, the Palm Pools Rule 30(b)(6) designee, stated in his deposition that he knew that Palm Pools was no longer insured by Scottsdale for lifeguard services under the primary policy in 2000. In his deposition, Palm Pools' agent, Warren Cox, also stated that he was aware that primary policies after 2000 did not include coverage for lifeguard services.

In 2001, Scottsdale changed the language of the Exclusion. Instead of excluding "all operations relating to lifeguards and/or pool management," the policy language was changed to exclude "all operations not related to pool sales, service or maintenance." In her deposition, Nunnally stated that the language was changed to be more consistent with Scottsdale's underwriting guidelines and was understood by the parties to continue to exclude liability arising from lifeguard services. Plaintiffs argue that this change would lead a reasonable person to believe that lifeguard services were again being covered. Importantly, however, it is undisputed that Nunnally, Cox, and Gochoel all still understood that Scottsdale did not provide coverage for lifeguard services under any primary policy issued after 2000, including the Primary Policy issued in 2008.[8] Yet, Gochoel stated in his deposition that he believed that there was coverage for lifeguard services under the excess policies issued after 2000, which he referred to as "umbrella" policies. He could not explain why he believed this – except for perhaps the import of the word "umbrella" – and he admitted that he never read any of the policies issued by Scottsdale. Despite Gochoel's understanding, the language of the Excess Policy is not at issue in

---

[8] In the primary policy issued for policy year 2007-2008, the Exclusion was again changed, this time excluding "swimming pools sales and services" from coverage. Nunnally claims this was an inadvertent error. In all other policies issued since 2001, including the policy at issue, the Exclusion has excluded from coverage "all operations not related to pool sales, service or maintenance."

this matter, as the parties agree that the Excess Policy clearly states that it follows the same exclusions as the Primary Policy.[9]

As previously discussed, four Palm Pools entities are plaintiffs in this action and defendants in the Underlying Lawsuit: (i) Palm Pool Management, Inc., (ii) Palm Pools Service Corp., (iii) Palm Pools Corp., of Maryland, and (iv) ICA/Palm Pools Corp.. In his deposition, Gochoel stated that he was advised by an attorney to divide operations among different corporations. This led to some corporate restructuring, but Gochoel admits that he never saw the process through to completion. Importantly, however, as part of the restructuring, Gochoel stated that ICA/PPC was created and took over all of Palm Pool Management, Inc.'s operations in 2004.

The named insured on the primary policies issued from 2000 until 2008 was "Palm Pools Management Corporation." Scottsdale claims that this was intended to refer to Palm Pool Management, Inc., even though that entity ceased all operations in 2004, while the plaintiffs claim that "Palm Pools Management Corporation" is not even a legal entity. In any event, even after 2004, when the named insured was either a non-existent entity (according to plaintiffs) or inactive entity (according to Scottsdale), claims continued to be reported to Scottsdale under the Primary Policy. Many of the claims were denied, but never based on the fact that the Palm Pools entity seeking coverage, including ICA/PPC, was not the named insured. For other claims, Scottsdale provided a defense under a reservation of rights which never raised the named insured

---

[9] Although Gochoel could cite no basis in the language of the Excess Policy to support his belief that lifeguard services were covered (he never read it), it is worth noting that in policy year 2003-2004, Scottsdale issued an "umbrella" policy to Palm Pools that does not appear to limit coverage based on the Exclusion.

issue. The parties dispute whether Scottsdale knew that it was actually dealing with ICA/PPC and not with Palm Pool Management, Inc. on these occasions.[10]

The policies specifically relevant to this matter provided coverage for the period from June 9, 2008 to June 9, 2009. The Primary Policy was issued to "Palm Pools Management Corporation", as it has been since 2001, and the Excess Policy was issued to "Palm Pools Inc.." Perhaps unsurprisingly, given the lack of attention to detail demonstrated thus far by the parties on the identity of the named insured, "Palm Pools Inc." is not even an existing legal entity. Scottsdale claims that this was an error and was intended to refer to Palm Pool Management, Inc., because the Excess Policy is a "follow form" policy that follows the terms, conditions, exclusions, definitions and endorsements of the Primary Policy.

The application for the Primary Policy, completed by Cox, adds to the confusion over the identity of the named insured. In the main application, the applicant was listed as "Palm Pools Inc."[11], and in the supplemental application, as "Palm Pools Management Inc.." Notably, the supplemental application states that the applying entity employs three full-time mechanics and

---

[10] In her deposition, Nunnally stated that to the best of her knowledge, the named insured was a legal entity and she relied on the insured and/or its agent to provide accurate information in this regard. In his deposition, Gochoel stated that he advised Cox at some point, although he is uncertain when, that Palm Pool Management, Inc. was no longer doing business. Cox stated that he was aware of corporate changes within the Palm Pools entities over the years, but that he relied on the fact that Palm Pools would notify him if there needed to be a change in the name of the entity seeking insurance. Gochoel further stated that he never read the policies, but even if he had done so, he would not have corrected the named insured because the policies appeared to be issued to Palm Pools generally, which apparently was close enough for him.

[11] The application which plaintiffs claim is for policy year 2008-2009 actually states the policy year as 2007-2008 but is dated June 9, 2008, suggesting that the policy year on the application is an error. Scottsdale does not dispute that this is the application for the policy year 2008-2009. The supplemental application that both parties have offered as the supplemental application for policy year 2008-2009 is also dated June 9, 2008 but does not include a policy year.

ten part-time lifeguards and services municipal pools, private clubs, hotels/motels, and condominiums.

## C.

The first issue presented is the identity of the named insured. Because the named insured was either an inactive or non-existent entity, there is clearly a latent ambiguity that requires resort to parol evidence. The parol evidence demonstrates that the intended insured was an existing, active entity, namely ICA/PPC. Scottsdale, seeking to avoid the conclusion that there is a latent ambiguity, argues that the named insured on the Primary Policy – "Palm Pools Management Corporation" – is synonymous with Palm Pool Management, Inc., an existing but inactive entity. If, as Scottsdale argues, the insured is Palm Pool Management, Inc., an inactive entity, then it is likely that Scottsdale would have no duty to defend or indemnify that entity in the Underlying Lawsuit since that entity provided no services at Lake Ridge (or anywhere else). Plaintiffs argue that these two names are not synonymous, and in any event, a latent ambiguity exists because the parties intended to insure an existing, active entity.

Plaintiffs' conclusion finds firm support in *Southern Ins. Co. of Virginia v. Williams*, 263 Va. at 570. There, the Supreme Court of Virginia found a latent ambiguity where, as here, the policy appeared to contemplate an existing, active corporate entity, and the named insured was not such an entity. *See Williams*, 263 Va. at 570 (finding a latent ambiguity when policy "contemplate[d] a legal organization with executive officers, a board of trustees, directors or governors, and stockholders," and the named insured was not a legal entity). Similarly, a latent ambiguity arises here because the policy on its face contemplates an active entity that provides swimming pool sales and services that warrants payment of a premium of over $12,000 per year. Yet, it is unclear whether the named insured – "Palm Pools Management Corporation" – refers to

-14-

Palm Pool Management, Inc., an entity with a similar name that does not operate at all, or ICA/PPC, an entity with a less similar name that actually carries out the business operations intended to be insured, namely operations relating to pool sales, service, or maintenance. Thus, it is appropriate to resort to parol evidence to determine the original understanding of the parties.

The pertinent parol evidence points persuasively to the conclusion that the parties, when the policy was issued, clearly understood that the entity to be covered was an active entity that conducted operations relating to pool sales, service, or maintenance. Although, the parties dispute whether Scottsdale or its agents actually knew that ICA/PPC was the precise name of the entity that conducted the operations to be covered by the policy, there is no genuine dispute regarding the parties' intention to insure a Palm Pools entity that was actually doing the business to be insured, namely operations relating to pool sales, service, or maintenance.

Indeed, it would be absurd to conclude that the Primary Policy and the Excess Policy, and all the policies issued since 2004 which collectively cost tens of thousands of dollars in premiums, were intended by the parties to cover the operations of an entity that was either nonexistent or completely inactive. To the contrary, as reflected in the supplemental application for the Primary Policy, which contained information on the number of mechanics and lifeguards employed and the types of clients served, the parties obviously intended to insure an entity that actually carried out operations. Moreover, both Cox and Nunnally unquestionably intended to insure an operating entity. Although Nunnally understood the insured Palm Pools entity to engage only in pool sales and maintenance, she clearly understood that it conducted business operations. Cox may have been in the dark regarding precisely which Palm Pools entity was active, but he knew, as is evident from the application he completed on behalf of Palm Pools, that whatever Palm Pools entity was being insured, that entity was an existing, active business.

And importantly, both Cox and Nunnally were agents of Scottsdale for purposes of issuing the policies, and thus their knowledge is properly imputed to Scottsdale.[12]

Scottsdale argues that it relied solely on representations of Palm Pools regarding what entity should be the named insured, and that it is the responsibility of the insured to provide accurate information on its application.  While it is true that an insured is obligated to complete an application truthfully, it is also true that "[a]n insurer seeking to rescind a contract based on an insured's alleged misrepresentation must clearly prove that (1) the insured's representation on the application was false; and (2) the false statement was material to the insurance company's decision to undertake the risk and issue the policy." *Great American Ins. Co. v. Gross*, No. 3:05CV159, 2008 WL 376263, at *5 (E.D. Va. February 11, 2008) (*citing* Va.Code § 38.2-309). Even if the named insured on the application was incorrect, that statement was not material to Scottsdale's decision to issue insurance.  Instead, it is apparent from the record that Scottsdale and its agents understood that an active and existing Palm Pools entity would be insured for operations relating to pool sales, service, or maintenance.  That entity was ICA/PCC, which performed those functions.

Scottsdale also argues that ICA/PPC was not the intended insured because, in addition to providing those services that Scottsdale claims to have intended to insure, ICA/PPC also provides lifeguard services, which Scottsdale claims that it did not intend to insure.  This argument fails.  The particular operations that are covered in the policy are addressed in the policy language and not in the identity of the entity to be insured.  In other words, a named insured may very well engage in operations beyond the scope of the policy, which is precisely why an insurer may want to include an exclusion.  It is the language of a policy, not the identity

---

[12] A licensed agent shall be held to be the agent of the insurer that issued the insurance in any controversy between the insured and the insurer. *See* Va.Code § 38.2-1801.

of the insured, that determines the scope of coverage.  In this instance, the identity of the insured was clearly an existing, active entity, namely ICA/PPC.  The fact that ICA/PPC may have provided, according to Scottsdale's reading of the policy, additional uninsured operations does not mean that it was not the entity that also carried out the insured operations.

No party has clean hands in this matter.  Neither Palm Pools nor Scottsdale took care to ensure that the proper entity was named on the insurance application or policies.  Cox, who was Scottsdale's agent for purposes of issuing the policy, knew of corporate changes within Palm Pools, but failed to take steps to clarify which Palm Pools entity should be the named insured. Cox also submitted applications in the same policy year with different applicants named on the primary and supplemental applications, demonstrating his own casual attitude toward the accuracy of the identity of the named insured.  Scottsdale accepted those applications, without questioning the clear inconsistency, and issued a Primary Policy to a variation of the name of one applicant and an Excess Policy to an entirely different entity, even though, as Scottsdale concedes, it was a follow-form policy.  Further evidence of Scottsdale's indifference to the accuracy of the named insured is the fact that Scottsdale fielded claims for years for Palm Pools entities that had names other than the name of the insured.  While it is disputed whether Scottsdale or its agents actually knew of this fact, even minimal investigation by Scottsdale would have brought the discrepancy to light.  Thus, Scottsdale, too, had little concern for the precise name of the insured.

In sum, the pertinent parol evidence in the record makes clear that the parties intended to insure the Palm Pools entity – namely ICA/PPC – that actually engaged in the pool operations they meant to insure, namely operations relating to pool sales, service, or maintenance.  Since the parties do not dispute that ICA/PPC conducted the operations intended to be insured under the

Primary Policy and Excess Policy, it must also be concluded that Scottsdale has no duty to defend or indemnify the other Palm Pools entities in the Underlying Lawsuit.[13]

### D.

The second question of policy interpretation presented is whether the Exclusion bars coverage for the negligent provision of lifeguard services and pool safety, rescue, and resuscitation equipment. It does not. The Exclusion's language is patently ambiguous in this regard and must therefore be construed against the insurer.[14]  The proper analysis here, as discussed in Section III, *supra*, is to determine whether any allegations in the Underlying Complaint may potentially be covered by the policies in issue. If so, Scottsdale has a duty to defend all of the allegations in the Underlying Lawsuit and, depending on the outcome of that lawsuit, to indemnify the insured. If not, then Scottsdale has no duty to defend or indemnify ICA/PPC.

There are essentially two types of allegations in the underlying complaint. First, the Lotts allege that Palm Pools did not provide competent lifeguards and/or managers and was negligent in hiring, training, retaining and/or supervising them. Second, the Lotts allege that Palm Pools

---

[13] Plaintiffs further argue that even if Scottsdale intended to cover only the inactive Palm Pool Management, Inc., Scottsdale may not raise this issue now because it failed to do so in response to plaintiff's motion for summary judgment. *See* Local Civil Rule 56(B) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."). While it is true that Scottsdale did not raise this issue earlier, it is also true that plaintiffs did not specifically assert that ICA/PPC was the intended insured in their motion for summary judgment, although this was certainly implicit in plaintiffs' claim of coverage. In any event, it is unnecessary to reach or decide this procedural dispute inasmuch as Scottsdale's named insured argument fails on the merits. Also unnecessary to reach or decide is whether the doctrines of waiver or estoppel in pais prohibit Scottsdale from asserting that ICA/PPC is not the intended insured.

[14] *See* notes 3, 4 and 7, *supra* (collecting cases).

failed to supply appropriate safety, rescue, and resuscitation equipment, including an automatic external defibrillator (AED).[15]

The Exclusion, in effect a double negative, bars coverage for any "bodily injury" arising out of "all operations not related to pool sales, service or maintenance." In simpler terms, the effect of the Exclusion is to extend coverage only to operations relating to "pool sales, service or maintenance." Scottsdale argues that neither lifeguard services, nor the provision of pool safety, rescue, and resuscitation equipment, are "related to pool sales, service, or maintenance," and thus are excluded from coverage. Plaintiffs counter by arguing that the term "service" is sufficiently broad to encompass lifeguard services or, at least, the provision of AEDs and other safety, rescue and resuscitation equipment.

Words in an insurance policy should be given "their usual, ordinary, and popular meaning, unless it can be clearly shown in some legitimate way that they were used in some other sense, and the burden of showing that they were used in some other sense is always on party alleging it." *See American Health Ins. Corp. v. Newcomb*, 197 Va. 836, 843, 91 S.E.2d 447, 451 (1956). And, in this regard, courts should not "strain to find ambiguities," and a provision is not ambiguous "merely because the parties disagree about their meaning." *Nextel WIP Lease Corp. v. Saunders*, 276 Va. 509, 516, 666 S.E.2d 317 (2008). Yet, the presence of an

---

[15] The Underlying Complaint alleges that Palm Pools owed a duty to Sara Lott and her beneficiaries to provide appropriate and operable pool safety, rescue, and resuscitation equipment. Scottsdale argues, unpersuasively, that provision of pool safety, rescue, and resuscitation equipment is embedded in the claims regarding incompetent lifeguards and/or managers and is not a stand-alone allegation. To the contrary, the allegations concerning the failure to provide adequate and functioning safety, rescue, and resuscitation equipment, including an AED, are independent grounds on which a jury might find liability and thus must be considered separately for purposes of the duty to defend analysis. In other words, it is possible that a jury could find Palm Pools negligent in failing to provide adequate pool safety, rescue, and resuscitation equipment on premises, but not negligent with respect to the provision of lifeguards or managers.

ambiguity here is inescapable given the breadth and nature of the word "service." The parties have offered many definitions of "service." Scottsdale relies on one narrow definition, namely "to repair or provide maintenance for," and argues that, in context, this is the only proper meaning. In elaborating its meaning, Scottsdale states that "service" in this context includes preparing the pool at the start of the swim season, winterizing the pool at the end of the season, and providing regular cleaning and chemical treatments, but does not include lifeguard or management services. Plaintiffs advocate for the broader, common understanding of service as "work done for others as an occupation or business,"[16] and "useful labor that does not produce a tangible commodity."[17] These broad definitions would undoubtedly include both lifeguard and management services as well as the provision of pool safety, rescue, and resuscitation equipment.

The term "service" is clearly ambiguous with regard to the provision of pool safety, rescue, and resuscitation equipment, including AEDs. Preparation of the pool at the start of the swim season, which even Scottsdale includes in its narrow definition of "service," might well include provision of such equipment. Tellingly, in its contract with Lake Ridge, ICA/PPC states that, as part of preparing the pool for opening, it would perform such tasks as checking all equipment and facilities, and setting up pool furniture and lifeguard chairs. In addition, an applicable local ordinance requires that every public or semi-public pool be equipped with certain safety and rescue equipment, suggesting its provision is a necessary part of pool opening. *See* Prince William County Code § 25-1-27. Scottsdale also argues that provision of such equipment is merely part of providing lifeguard services. Yet, this is not necessarily true; safety, rescue, and resuscitation equipment may be required at a pool whether or not lifeguards are on

---

[16] Webster's II *New Riverside University* Dictionary.

[17] Merriam-Webster Dictionary.

duty.[18]  Furthermore, provision of such equipment may fall not only under "service", but also under "maintenance", since pool maintenance may easily be understood to include upkeep of pool equipment, including safety, rescue, and resuscitation equipment.  In sum, even when accepting Scottsdale's narrow definition of "service," the Exclusion does not unambiguously bar coverage for provision of pool safety, rescue, and resuscitation equipment, including AEDs.

The conclusion that the Exclusion is ambiguous with respect to provision of pool safety, rescue, and resuscitation equipment does not end the analysis. The next question to be addressed is whether the ambiguity is patent, in which case it must be construed against the insurer, or latent, in which case resort to parol evidence is proper.[19]  In this instance, the ambiguity is patent because it is apparent on the face of the policy that the Exclusion can be construed in more than one way, and the ambiguity has been apparent since the day that the policy was written and issued. *See Va. Elec. & Power Co..*, 278 Va. at 460 ("Normally, an ambiguity in a contact is 'patent,' that is, the language of the contract itself reveals that it can be interpreted in more than one way.").  In other words, Scottsdale could easily have written an exclusion that barred

---

[18] Scottsdale also argues unpersuasively that the Exclusion bars coverage for pool management, and that the provision of safety, rescue, and resuscitation equipment is a function of pool management.  No language in the Exclusion or anywhere in the policies suggests that "pool management" is unambiguously excluded from coverage.  The lack of professional liability coverage, which Scottsdale emphasizes, does not unambiguously distinguish and bar coverage for the management of "operations relating to pool sales, service or maintenance," while simultaneously allowing coverage for non-management "operations relating to pool sales, service or maintenance."  Simply put, the policy language does not draw any distinction between management and non-management operations.

[19] Scottsdale argues that even if the ambiguity is patent, resort to parol evidence is proper.  As discussed in Section IV(A), *supra*, however, Virginia law bars consideration of parol evidence when there is a patent ambiguity in an insurance policy.  Furthermore, while parol evidence likely results in the conclusion that lifeguard services were not intended to be covered by the Primary Policy, parol evidence certainly does not demonstrate the same conclusion with respect to pool safety or rescue equipment.

provision of pool safety, rescue, and resuscitation equipment from coverage, but failed or chose

not to do so.   *See Lincoln Nat. Life Ins. Co.*, 229 Va. 132, 136, 327 S.E.2d 98, 101 (1985)

(finding term "actively at work" patently ambiguous because "[t]he policy nowhere defines the

term," "[a]pplication of the term is not limited [by the policy]," and "[t]he insurer readily could

have narrowed the term's meaning by inserting language that limited the scope of the phrase.").

Since the Exclusion is patently ambiguous, it must be construed against the insurer.[20]  In

the words of the Supreme Court of Virginia:

> It is not incumbent upon us to resolve the parties' dispute as to the effect of [the
> exclusion].  As we said, in [*Nusbaum*], '[i]t was incumbent upon the insurer to
> employ exclusionary language clear enough to avoid any such ambiguity, if it
> wished to exclude coverage.

*Smith v. Allstate*, 241 Va. 477, 480, 403 S.E.2d 696, 697-698 (1991) (*quoting St. Paul Ins. v.*

*Nusbaum & Co.*, 227 Va. 407, 412, 316 S.E.2d 734, 736 (1984)).  If Scottsdale intended to attach

a meaning to the Exclusion that barred provision of pool safety, rescue, and resuscitation

equipment, it was required to express that intention in clear and unambiguous language.

*Bottoms*, 243 at 233; *Smith*, 241 at 403.  As Scottsdale failed to do so, it is appropriate to

conclude that the Primary Policy and Excess Policy provide coverage with respect to the

Underlying Complaint's allegation that Palm Pools was negligent in its provision of pool safety,

rescue, and resuscitation equipment.

The parties also dispute whether the exclusion is ambiguous with respect to coverage for

the provision of lifeguard services.  This is a closer question.  It would seem unjust to permit

plaintiffs to claim the policy is ambiguous as to the provision of lifeguard services where, based

on the record, all parties apparently knew that no such coverage was provided in the Primary

Policy.  Gochoel stated in his deposition that, although he believed there was coverage under the

---

[20] *See* notes 3, 4 and 7, *supra* (collecting cases).

Excess Policy, he knew that the Primary Policy did not cover lifeguard services.[21]  Cox and

Nunnally also both stated that they knew the Primary Policy did not cover lifeguard services.  In

any event, whether the Exclusion is ambiguous with respect to lifeguard services need not be

reached or decided because Scottsdale has a duty to defend all allegations in the Underlying

Complaint in the event that any are covered and, as discussed, allegations regarding provision of

pool safety, rescue, and resuscitation equipment are covered.[22]

## V.

For the foregoing reasons, Scottsdale has a duty to defend ICA/PPC in the Underlying

Lawsuit.  The question of whether Scottsdale has a duty to indemnify cannot be decided on

summary judgment at this time, as the duty to indemnify can only be determined after resolution

---

[21] Importantly, the Excess Policy unambiguously incorporates the Exclusion, therefore parol evidence, such Gochoel's understanding, cannot be considered to determine the scope of the Excess Policy. *See Partnership Umbrella, Inc.*, 260 Va. at 133; *Hill*, 237 Va. at 152.

[22] *See CACI Intern., Inc. v. St. Paul Fire and Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009) ("Virginia and other states recognize the 'potentiality rule,' wherein 'an insurer's duty to defend is triggered if there is any possibility that a judgment against the insured will be covered under the insurance policy.'"); *Fuisz v. Selective Ins. Co. of America*, 61 F.3d 238 (4th Cir. 1995) ("If both covered and excluded acts are alleged against insured, duty to defend attaches."); *Brenner v. Lawyers Title Ins. Corp.*, 240 Va. 185, 189, 397 S.E.2d 100, 102 (1990) ("The obligation to defend arises whenever the complaint against the insured alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy."); *Parker v. Hartford Fire Ins. Co.*, 222 Va. 33, 35, 278 S.E.2d 803, 804 (1981) ("Only when 'it appears clearly [the insurer] would not be liable under its contract for any judgment based upon the allegations,' does the company have no duty to defend."); *Lerner v. General Ins. Co. of America*, 219 Va. 101, 104, 245 S.E.2d 249, 251 (1978) ("[A]n insurer's obligation to defend is broader than its obligation to pay, and arises whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy."). *See also* Couch on Insurance § 200:25 (3d ed. West 2010) (explaining that "[i]n the majority of jurisdictions, an insurer's duty to defend extends to the entire action, which includes covered, potentially covered, and uncovered allegations within the claim").

of the facts alleged in the Underlying Complaint.[23]  Whether there is a duty to indemnify and its

extent will be addressed, if necessary, after the conclusion of Underlying Lawsuit.[24]

An appropriate Order will issue.

Alexandria, Virginia
October 27, 2011

_____
T. S. Ellis, III
United States District Judge

---

[23] See *Minnesota Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 355 Fed.Appx. 698, 704 (4th Cir. 2009) (*quoting Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004)); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Block Roofing Corp.*, 754 F.Supp.2d 819 (E.D.Va. 2010).

[24] At this time, entry of final judgment on the duty to defend issue under Rule 54(b), Fed.R.Civ.P., is appropriate.  Certification under Rule 54(b) is a two-step process.  First, the district court must determine whether the judgment is final.  Second, the district court must determine whether there is no just reason for delay in the entry of judgment.  *See Brashewell Shipyards, Inc. v. Beazer East, Inc.*, 2 F.3d 1331, 1335 (4th Cir. 1993).  While Rule 54(b) certification is recognized as the exception rather than the norm, it is proper here. *Id.* First, this is the ultimate decision on the duty to defend issue.  Second, there is no just reason for delay in the entry of judgment.  In fact, the consequences of delay counsel in favor of issuing final judgment at this time.  An appellate ruling that Scottsdale is not obligated to defend would moot the indemnification issue, thus the interests of judicial economy are best served by Rule 54(b) certification.  *See Penn-America Ins. Co. v. Mapp*, 521 F.3d 290, 296 (4th Cir. 2008) (*citing Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631 (4th Cir. 2005)).  Equitable considerations also favor certification under Rule 54(b) because the duty to indemnify issue may not be resolved for a considerable period of time, during which Scottsdale will be required to defend ICA/PPC, perhaps at substantial cost.  *See Peace College of Raleigh, Inc. v. Am. Intern. Specialty Lines Ins. Co*, No. 5:09cv479, 2010 WL 3743539, at *11 (E.D.N.C. Sept. 16, 2010).